UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
: Chapter 11
In re :
: Case No. 22-10425 (MG)
Corinthian Communications Inc., :
:
Debtor. :
------------------------------------------------------------ x

# DECLARATION OF ERIC HUEBSCHER IN SUPPORT OF UNITED STATES TRUSTEE'S MOTION TO REMOVE THE DEBTOR AS DEBTOR IN POSSESSION PURSUANT TO 11 U.S.C. § 1185

I am the Subchapter V Trustee in the above-mentioned case. I make this declaration based on personal knowledge, information, and belief formed from my records, testimony provided at the May 5, 2022, and June 9, 2022 ("Meetings of Creditors"), documents produced by the Debtor and my personal review earlier today of the docket of this case on the PACER information system. If called, I would testify to the following:

1. The Debtor, a New York S-corporation, is 100% owned by Larry Miller who is the President and sole director of the Debtor. Attached hereto as <u>Exhibit A</u> is a copy of the Entity Information for the Debtor listed with the New York Department of State/Divisions of Corporations for the Debtor.

2. I learned at the Meetings of Creditors, and then subsequently in the *Supplemental Declaration of Larry Miller Pursuant to Local Bankruptcy Rule 1007-2* ("Supplemental 1007 Affidavit"), that the Debtor provides bookkeeping and payroll for three non-debtor affiliates: (a) Corinthian Trading Inc. ("Trading"), (b) Corinthian Media Inc. ("Media"), and (c) Broadcast Buying Services ("Broadcast Buying"), all of which are 100% owned by Mr. Miller. The

Debtor, Media, Trading, and Broadcast Buying (collectively, the "Corinthian Enterprise") have been in existence and working together over the last forty years. Exhibit C at 4: 21-25, 5:1-5.

3. Attached hereto as <u>Exhibit B</u> is a copy of the transcript of the Meeting of Creditors from May 5, 2022.

4. Attached hereto as <u>Exhibit C</u>, is a copy of the transcript of the Meetings of Creditors from June 9, 2022.

5. I learned at the Meetings of Creditors, and then subsequently in the Supplemental 1007 Affidavit that Media, Trading, and Broadcast Buying earn revenue from outside sources and these funds (less the cost of services) flow to the Debtor. Exhibit C 18:3-20.

6. I also learned at the Meetings of Creditors, that there is no intercompany agreement in place that sets forth the frequency or amount of funds that flow to the Debtor. Exhibit B at 34:23-25, 35:1-9.

7. At the Meeting of Creditors that took place on June 9, 2022, the Debtor was joined by his accountant, Michael Block, CPA. Based on my review of the 2019 and 2020 tax returns of the Debtor, Media, and Trading, I know that Mr. Block prepared them.

8. Attached hereto as <u>Exhibit D</u> is a copy of the Debtor's application for a Paycheck Protection Program Loan that was submitted in or about April 2020 (the "First PPP Loan Application").

9. Below is a screen shot of Question 3 on page 8 of 16 of the First PPP Loan Application:

| | Yes | No |
|---|---|---|
| Is the Applicant or any owner of the Applicant an owner of any other business, or have common management with, any other business? If yes, we will request a listing of all Affiliates and a description of the relationship documented on a separate sheet identified as addendum A. | ○ | ● |

2

10. At the Meeting of Creditors held on June 9, 2022, Mr. Miller testified that Charlotte Pelcman (office manager) and Michael Block (accountant) assisted him with filing out the First PPP Loan Application. Exhibit C at 28:14-18.

11. In or about May 2020, the Debtor received $448,985.00 ("First Draw"), which was subsequently forgiven on September 20, 2021. A copy of the forgiveness letter is attached as Exhibit E hereto.[1]

12. Attached hereto as Exhibit F is a copy of the Debtor's application for a Paycheck Protection Program Loan that was submitted in or about February 2021 (the "Second PPP Loan Application").

13. Below is a screen shot of a question that appears on page 1 of 5 of the Second PPP Loan Application.

Is the Applicant or any owner of the Applicant an owner of any other business, or have common management (including a management agreement) with any other business? If yes, list all such businesses (including their TINs if available) and describe the relationship on a separate sheet identified as addendum A.:
No

14. To obtain a second draw of funds the Debtor provided the following information on page 2 of 5 pf the Second PPP Loan Application to show a 25% reduction in gross receipts between comparable quarters in 2019 and 2020.

Second Draw Information

| | | | |
|---|---|---|---|
| First Draw SBA Loan Number: | 3160087302 | First Draw SBA Loan Amount: | $448,985.00 |
| Reference Quarter: | 3Q 2019 | Reference Quarter Gross Receipts: | $15,772,851.61 |
| 2020 Quarter: | 3Q 2020 | 2020 Quarter Gross Receipts: | $11,059,673.38 |
| | | Revenue Reduction: | 29.88% |

---

[1] The filed copy of the forgiveness letter from Bank of America is redacted to remove the account number. As mentioned in the Motion, the United States will supply an unredacted copy of this exhibit (and other redacted exhibits) to the Court.

15. To obtain the second draw through the PPP Loan process, the Debtor needed to prove: (a) that it had previously received a first draw PPP loan and will or has used the full amount for authorized uses, (b) has no more than 300 employees, and (c) can demonstrate at least a 25% reduction in gross receipts between comparable quarters in 2019 and 2020.

16. After the May 5, 2022 Meeting of Creditors, Susan Arbeit and I requested that the Debtor produce information regarding the calculation of the reduction of quarterly gross receipts of the Debtor.

17. Attached hereto as <u>Exhibit G</u>, is a excel spreadsheet that the Debtor prepared and produced labeled 2nd Draw/Verification of Revenue Reduction (the "Revenue Reduction Spreadsheet").

18. The Revenue Reduction Spreadsheet shows that the Debtor used the quarterly gross receipts of CMI, BBS, and CTI, instead of the quarterly gross receipts of the Debtor, to calculate the quarterly revenue reduction. The Debtor has not supplied any comparative quarterly gross receipts information for the Debtor.

19. Mr. Miller testified that CMI was an abbreviation for Media, BBS was an abbreviation for Broadcast Buying, and CTI was an abbreviation for Trading. Exhibit C at 34:20-25, 35:1-3.

20. When asked why the Debtor used Media's, Trading's, and Broadcast Buying's quarterly gross receipts instead of the Debtor's own quarterly gross receipts, Mr. Miller testified that he didn't understand and didn't perform the calculation. Exhibit C at 35:4-11.

21. Mr. Block then testified that he was the one that performed the calculations for the Second PPP Loan Application, and he used Media's gross income "because Corinthian Media had lost substantial clients, specifically, the Broadway shows". Exhibit C at 35:12-25, 36:1-19, 37:10-20.

22. Mr. Block admitted, however that Media was not the applicant, and that Media didn't file for its own PPP Loan. Exhibit C at 37:21-25, 38:1.

23. No entity in the Corinthian Enterprise, besides the Debtor, applied for PPP Loans. *See* Exhibit C at 37:24-25, 38:1.

24. In or about March 2021, the Debtor received $449,331.80 ("Second Draw"), which was subsequently forgiven on November 29, 2021. A copy of the forgiveness letter is attached as Exhibit H hereto.

25. Based on my review of the 2019 and 2020 tax returns for the Debtor, Media, and Trading it appears that each is a separate and distinct S corporation. Each has its own EIN, and each entity files its own tax returns. *See* Exhibit C at 37:1-9.

26. Ms. Arbeit and I have requested from the Debtor (a) a copy of Broadcast Buying's formation documents, (b) proof that it is an active corporation, and (c) copies of its corporate tax returns for 2019 and 2020. To date, this information has not been produced by the Debtor.

27. Mr. Miller testified at the Meetings of Creditors that prior to the start of the COVID-19 Pandemic (the "Pandemic"), the Corinthian Enterprise shared office space on the fifth floor of 500 Eighth Avenue, New York, NY 10018. Exhibit C at 21:13-19. Post Pandemic, the Corinthian Enterprise shares a post office box in New York City. Exhibit C at 27:21-25, 28:1-2. Mr. Miller also testified at the Meetings of Creditors that all the Debtor's employees, regardless of which business line they work for, has email address with the domain name "mediabuying.com" and prior to the Pandemic, all of the Debtor's employees had phone extension linked to a shared main number for the Corinthian Enterprise. Exhibit C at 26:19-25, 27:1-12.

28. Mr. Miller testified at the Meetings of Creditors that the Debtor is the only entity in the Corinthian Enterprise that has employees. Mr. Miller testified that the Debtor has approximately 30 employees, 60% of whom work primarily for Media's business, 25% of whom work primarily for Broadcast Buying's business, 3% of whom work primarily for Trading's business, and the remainder who perform back-office work. Exhibit C at 22:1-18, 24:1-20.

29. [THIS SECTION IS LEFT INTENTIONALLY BLANK]

30. The Debtor's general liability insurance is held in the name of the Debtor and Broadcast Buying. A copy of the Debtor's general insurance policy is attached hereto as Exhibit I.[2]

31. Mr. Miller testified that the Debtor has no employment agreements with its employees and there is no agreement setting forth Mr. Miller's compensation structure. Exhibit C at 46:8-13. Mr. Miller testified that commission and salaries are not memorialized in writing, instead it is done "[b]y a good old fashioned ... handshake." Exhibit C at 46:14-21.

32. Mr. Miller testified that he does not recall ever being asked to hold board meeting for the Debtor. Exhibit B at 36:23-25; 37:1-16.

33. Mr. Miller testified at the Meeting of Creditors that a trust for the benefit of his children owns approximately 20% of the ownership interests of 500 Eight Avenue, LLC, the landlord. Exhibit B at 37:21-25, 38:1-10.

34. Attached hereto as Exhibit J is a copy of Statement 1-4 of the 2019 1120-S Tax Return of the Debtor.[3] On the attached exhibit the Debtor lists its deductible expenses. As discussed below, Ms. Arbeit and I requested a breakdown from the Debtor of the following expenses on the

---

[2] The filed copy of the general insurance policy certificate is redacted to remove the policy number.

[3] In the interest of full disclosure, the United States Trustee will provide the Court with a copy of the Debtor's 2019 and 2020 tax returns.

Debtor's tax return: (a) Consulting Service, (b) Legal and Professional, (c) Rating Service, and (d) Insurance.

35. Attached hereto as <u>Exhibit K</u> is a copy of Statement 1-4 of the 2020 1120-S Tax Return of the Debtor. On the attached exhibit the Debtor lists its deductible expenses. As discussed below, Ms. Arbeit and I requested a breakdown from the Debtor of the following expenses on the Debtor's tax return: (a) Consulting Service, (b) Legal and Professional, (c) Rating Service, and (d) Insurance.

36. Ms. Arbeit and I have requested multiple times the following documents from the Debtor:

- Formation documents for Broadcast Buying and information on whether its is an active corporation.

- 2019 and 2020 federal tax returns for Broadcast Buying.

- A breakdown of four large expenses listed in the Debtor's federal tax returns: (a) Consulting Services, (b) Legal and Professional Fees, (c) Rating Services, and (d) Insurance.

- Backup of "Trust" disbursements from the Debtor's bank account: $7,314.70 (on 4/19/22) and $7,314.70 (on 4/26/20).

- Cancelled checks from April 2022 monthly operating report.

- Information regarding the 40 other limited liability companies wholly owned by Mr. Miller.

- Information on whether there would be a reduction in premiums if Broadcast Buying was removed as an insured from the Debtor's general liability insurance policy.

To date, these documents have not been produced by the Debtor.

37. I am prepared and willing to continue to serve in this case if the Debtor is removed as debtor in possession. My experiences in this regard include numerous appointments and assignments over the last 15 years, including:

- In February 2020, I was appointed by the Office of the United States Trustee as a Subchapter V Trustee for the Eastern, Southern, Western, and Northern Districts of

7

New York and the District of Vermont. Since my appointment, I have overseen numerous Chapter 11/Subchapter V matters in several jurisdictions.

- Appointed as Patient Care Ombudsman in 18 cases in 6 jurisdictions over the past 13 years.

- I have served as financial advisor to the Committee of Unsecured Creditors, Plan Administrator, Litigation Trustee, and several matters in the Eastern and Southern Districts of New York.

- I was appointed as Examiner in a matter in the Southern District of New York involving the investigation of numerous business entities and related banking arrangements.

- Led the forensic investigation of a mortgage fraud scheme with the United States Attorney's Office in the Eastern District of New York.

- I have served as both a State and Federal receiver and assisted in numerous fraud and forensic investigations.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 15, 2022
New York, New York

*/s/ Eric Huebscher*
Eric Huebscher, Chapter V Trustee