UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
                                  :

In re                              :    HEARING DATE: July 7, 2022
                                  :    HEARING TIME: 10:00 A.M.

Corinthian Communications Inc.,      :

                                  :    Chapter 11

                 Debtor        :    Case No. 22-10425 (MG)

                                  ::
------------------------------------------------------------ x

---

## MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO REMOVE DEBTOR IN POSSESSION PURSUANT TO 11 U.S.C. § 1185(a)

---

Eric H. Horn
Heike M. Vogel
Jordan M. Engelhardt
A.Y. STRAUSS LLC
101 Eisenhower Parkway, Suite 412
Roseland, NJ 07068
973-287-5006

*Attorneys for the Debtor and
Debtor in Possession*

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 2

    A.    GENERAL BACKGROUND ................................................................... 2

    B.    LARRY MILLER AND THE CORINTHIAN COMPANIES ............................. 3

    C.    SEVERE HARDSHIP SUFFERED BY THE CORINTHIAN
            COMPANIES AS A RESULT OF THE COVID-19 PANDEMIC ...................... 4

    D.    THE PAYCHECK PROTECTION PROGRAM LOANS ................................... 5

    E.    THE U.S. TRUSTEE'S MOTION ......................................................... 6

LEGAL ARGUMENT ............................................................................................. 6

THE TRUSTEE FAILS TO ESTABLISH CAUSE TO REMOVE THE DEBTOR
    IN POSSESSION ........................................................................................... 6

    A.    LEGAL STANDARD ......................................................................... 6

    B.    THE UST'S MOTION IS PREMATURE AND LACKS
            EVIDENTIARY SUPPORT .................................................................. 7

            1.    The UST Fails to Demonstrate Fraud ....................................... 9

            2.    The UST's Allegations of "Gross Mismanagement" are
                 Baseless ............................................................................. 17

            3.    The UST's Suggestion of a Conflict of Interest is Entirely
                 Speculative and Contrary to the Record ................................... 18

            4.    The UST's Attacks on the Debtor's and Mr. Miller's
                 Credibility are Unfounded ..................................................... 19

    C.    REMOVING THE DEBTOR IN POSSESSION WILL LEAD TO
            LIQUIDATION OF THE DEBTOR AND GRAVELY HARM
            THE ESTATE ................................................................................ 22

    D.    THE TRUSTEE FAILS TO ESTABLISH THAT MR.
            HUEBSCHER IS QUALIFIED TO TAKE POSSESSION OF THE
            DEBTOR OR THAT INSTALLING HIM WOULD SERVE THE
            INTERESTS OF THE ESTATE .............................................................. 24

    E.    THE UST'S MOTION SHOULD BE DENIED WITHOUT NEED
            FOR AN EVIDENTIARY HEARING ...................................................... 25

CONCLUSION ..................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Home Assur. Co. v. Merck & Co.*,
   386 F. Supp. 2d 501 (S.D.N.Y. 2005) ................................................................. 16

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) .......................................................................... 10, 11

*Berman v. Le Beau*,
   62 B.R. 262 (S.D.N.Y. 1986)............................................................................. 11

*Contra In re Ashley River Consulting, LLC*,
   Case No. 14-13406 (MG), 2015 WL 1540941 (Bank. S.D.N.Y. 2015) ................... 8

*In re 4 C Sols., Inc.*,
   289 B.R. 354 (Bankr. C.D. Ill. 2003)................................................. 7, 17, 23, 24

*In re F.A. Potts & Co.*,
   20 B.R. 3 (Bankr. E.D. Pa. 1981) ..................................................................... 10

*In re LHC, LLC*,
   497 B.R. 281 (Bankr. N.D. Ill. 2013) ................................................ 10, 14, 22, 23

*In re N. Star Contracting Corp.*,
   128 B.R. 66 (Bankr. S.D.N.Y. 1991)................................................................. 24

*In re Neosho Concrete Prod. Co.*,
   No. 20-30314, 2021 WL 1821444, at *8 (Bankr. W.D. Mo. May 6, 2021) ......... 7, 22

*In re Ozcelebi*,
   639 B.R. 365, 2022 WL 990283, at *7 (Bankr. S.D. Tex. 2022) ................. 8, 19, 22

*In re Peak Serum, Inc.*,
   623 B.R. 609, 614 n.1 (Bankr. D. Colo. 2020) ...................................................... 7

*In re Sillerman*,
   605 B.R. 631 (Bankr. S.D.N.Y. 2019) ..................................................... 7, 18, 25

*In re Sletteland*,
   260 B.R. 657 (Bankr. S.D.N.Y. 2001)............................................................... 17

*In re Sundale, Ltd.*,
   400 B.R. 890 (Bankr. S.D. Fla. 2009) ............................................................... 17

*In re The 1031 Tax Grp., LLC,*
    374 B.R. 78 (Bankr. S.D.N.Y. 2007) .................................................................. 7, 9, 25

*In re Tri-State Roofing,*
    Case No. 20-40188-JMM, 2020 WL 7345741, at \*1-4 (Bankr. D. Idaho Dec. 7, 2020) ......... 25

*Keeley and Grabanski Land P'ship v. Keeley (In re Keeley & Grabanski Land P'ship),*
    455 B.R. 153 (B.A.P. 8th Cir. 2011) ............................................................................. 7

*Lama Holding Co. v. Smith Barney Inc.,*
    88 N.Y.2d 413 (N.Y. 1996) ...................................................................................... 10

*Premium Mortg. Corp. v. Equifax, Inc.,*
    583 F.3d 103 (2d Cir. 2009) ................................................................. 10, 11, 12, 16

*Schuster v. Dragone,*
    266 B.R. 268 (D. Conn. 2001) .................................................................................. 24

**Statutes and Rules**

11 U.S.C. § 1104(a) ................................................................................................ 6, 17

11 U.S.C. § 1104(a)(1) ................................................................................................ 10

11 U.S.C. § 1106(a)(3) .................................................................................................. 8

11 U.S.C. § 1107 ............................................................................................................ 3

11 U.S.C. § 1108 ............................................................................................................ 3

11 U.S.C. § 1183(a) ........................................................................................................ 3

11 U.S.C. § 1183(b)(2) .............................................................................................. 1, 8

11 U.S.C. § 1183(b)(5) ......................................................................................... 3, 6, 24

11 U.S.C. § 1183(b)(7) ............................................................................................ 1, 22

11 U.S.C. § 1184 ............................................................................................................ 6

11 U.S.C. § 1185(a) ............................................................................................... 6, 10, 17

11 U.S.C. § 1186(b) ....................................................................................................... 6

86 FR 3712 ................................................................................................... 13, 14, 15

Fed. R. Bankr. P. 9014(d) .......................................................................................... 25

N.Y. Bus. Corp. L. § 717(a) ................................................................................... 11, 12

## PRELIMINARY STATEMENT

The U.S. Trustee's motion to remove the Debtor as debtor in possession is hasty, premature and, consequently, utterly lacking in evidence and premised on legal error. In a bankruptcy under Subchapter V of Chapter 11, the trustee has the statutory duty, unique among bankruptcy trustees, to facilitate the development of a consensual plan of reorganization. *See* 11 U.S.C. § 1183(b)(7). In addition, the Subchapter V trustee is not authorized to investigate the Debtor's conduct or finances unless "the court, for cause . . . so orders." 11 U.S.C. § 1183(b)(2).

The Subchapter V Trustee in this case, Eric Huebscher, has not sought any investigative authority. Yet Mr. Huebscher did not ask one question at the Section 341 Meeting of Creditors in furtherance of his duty to facilitate a consensual plan. Instead, every question was investigative in content and adversarial to the Debtor in tone. His main focus was on questioning the Debtor's principal, Larry Miller, and its public accountant, Michael Block, about why they included the gross receipts of the Debtor's affiliates in the revenue-reduction calculation submitted in the Debtor's second draw Paycheck Protection Program loan application. *See* Declaration of Eric Huebscher ("Huebscher Decl.") Ex. C (ECF 37-4) at 37:1-38:2. Mr. Huebscher's theory was that "if they're separately distinguished, legal entities with separate taxpayer IDs filing separate tax returns," the Debtor should have "use[d] the amount directly from the taxpayer ID associated with the applicant, which is the Debtor." *Id.* at 37:10-16.

Less than one week after the Creditors' Meeting, the U.S. Trustee brought this motion accusing the Debtor and Mr. Miller of "fraudulently obtain[ing]" PPP loans, based in significant part on Mr. Huebscher's theory that the Debtor had "fraudulently" included its affiliates' gross receipts in its revenue-reduction calculation. *See* UST Br. at 6-8. In making the motion, the U.S. Trustee and Mr. Huebscher chose to ignore evidence demonstrating that the Debtor's revenues derive entirely from those of its affiliates and, thus, the Debtor had, in fact, made a reasonable,

good faith effort to accurately present its revenue losses in its PPP application.

The motion also rested on a fundamental error in Mr. Huebscher's and the U.S. Trustee's interpretation of SBA regulations. Remarkably, Mr. Huebscher and the U.S. Trustee apparently did not review the SBA rules governing reporting of revenue losses in PPP loan applications before publicly accusing the Debtor and Mr. Miller of PPP fraud. Instead, the U.S. Trustee informed the Court only two days ago that it had "recently learned new information" indicating that affiliate revenue *should* be included in revenue-loss calculations under SBA rules. ECF 43. In other words, the U.S. Trustee finally read the SBA regulations published in January 2021 governing the "fraud" issue they had already raised, and it contradicts the U.S. Trustee's theory behind this motion.

Rather than withdraw the motion, the U.S. Trustee now claims that "to the extent it could be inferred from the Motion and Declaration of Eric Huebscher that the Debtor should not have used [its affiliates'] gross receipts for calculating its gross receipts reduction, such inference would be incorrect." ECF 43. Make no mistake, the erroneous "using affiliate revenue" theory was central to the motion's "fraud" accusations. Further, as demonstrated in detail below, the U.S. Trustee's motion presents nothing close to the clear and convincing evidence of "fraud" or other misconduct that would warrant dispossessing the Debtor. And it is utterly silent on whether removal of the Debtor in favor of Mr. Huebscher operating the business would serve the interests of creditors, equity holders, and the estate. The motion should be denied in its entirety.

## FACTUAL BACKGROUND

### A.    General Background

On April 4, 2022, Corinthian Communications Inc. (the "Debtor," or "Corinthian Communications") filed a voluntary petition for relief under Subchapter V of Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of

New York.  *See* ECF 1.  The Debtor continues to operate its business and manage its property as a debtor-in-possession ("DIP") in accordance with §§ 1107 and 1108 of the Bankruptcy Code.

On April 5, 2022, the United States Trustee ("UST") appointed Eric Huebscher (the "Subchapter V Trustee") as the trustee in this case under § 1183(a) of the Bankruptcy Code.  *See* ECF 12.  Mr. Huebscher intends to seek compensation for his time at a rate of $425 per hour and reimbursement for his expenses as administrative expenses of the estate.  *See* ECF 12 at 2.

A meeting of creditors pursuant to § 341(a) of the Bankruptcy Code was held on May 5, 2022 and continued on June 9, 2022 (together, the "Creditors' Meeting").  *See* Declaration of Eric Huebscher ("Huebscher Decl.") Ex. B (ECF 37-3, 5/5/22 341 Mtg. Tr.) and Ex. C (ECF 37-4, 6/9/22 341 Mtg. Tr.).

Less than a week after the continued Creditors Meeting, Mr. Huebscher submitted his declaration informing the Court that he is "prepared and willing to continue to serve in this case if the Debtor is removed as debtor in possession" (Huebscher Decl. ¶ 37) – which would necessarily include the day-to-day and hour-to-hour task of "operat[ing] the business of the debtor" under § 1183(b)(5) of the Bankruptcy Code – at his $425 hourly rate.

## B.    Larry Miller and the Corinthian Companies

The Debtor was founded by Larry Miller in 1974 as a full-service media planning and buying company dedicated to serving the New York City market.  Miller Decl. ¶ 2.  At the start, Mr. Miller was the sole employee and ran all aspects of the Debtor's business.  *Id.*  The Debtor's business expanded over time, and with the addition of new employees and business lines, the corporate structure of the business evolved.  *Id.*  The Debtor now exists to provide employees and office services to the following non-debtor entities: Corinthian Trading Inc.; Corinthian Media Inc; and Broadcast Buying Services (each a "Non-Debtor Entity," collectively the "Non-Debtor Entities," and together with the Debtor, the "Corinthian Companies").  *Id.*  Mr. Miller is

the sole owner of each of the Corinthian Companies.  Miller Decl. ¶ 2.  Mr. Miller is the President of the Debtor.  *Id.* ¶ 1.

The Non-Debtor entities are operating companies that provide media services to third-party clients.  Miller Decl. ¶ 5.  For example, clients engage Corinthian Media to provide media planning and buying services for their advertising campaigns.  Broadcast Buying Services operates similarly, focusing on clients that require direct response marketing and advertising services. *Id.*  Corinthian Trading's business is somewhat different.  It primarily engages in barter transactions to acquire media time at a discount and then sells that media time to Corinthian Media to make available to its clients.  *Id.*

For its part, the Debtor (Corinthian Communications) is the service entity that provides employees and administrative services to the Non-Debtor Entities.  Miller Decl. ¶¶ 2, 6.  The Debtor employs all of the employees who support the operations of, and serve clients through, the Non-Debtor Entities.  *Id.* ¶ 6.  As the Non-Debtor Entities earn revenues from their operating activities, they pay the Debtor to cover payroll and other overhead expenses for all of the Corinthian Companies.  *Id.* ¶ 5.

The Corinthian Companies represent Larry Miller's life's work.  Miller Decl. ¶ 23.  They are also the professional home of a group of seasoned, dedicated professionals, the vast majority of whom have been with the Corinthian Companies for over a decade, and many of whom have been with the Corinthian Companies for over 30 years.  *Id.* ¶ 8.

**C.** **Severe Hardship Suffered by the Corinthian Companies as a Result of the COVID-19 Pandemic**

Even before the COVID-19 pandemic began in March 2020, the Corinthian Companies' business showed signs of decline starting in approximately 2016.  *See* Miller Decl. ¶ 9.  As the sole owner, Mr. Miller elected not to receive any compensation or profit distributions for the

Debtor or any Non-Debtor entity since that time. *Id.* He nevertheless worked hard to serve the Corinthian Companies' clients and preserve the jobs of the Debtor's long-serving employees. *Id.*

The Debtor's employees have made sacrifices as well. More than half have not received raises in more than a decade. Miller Decl. ¶ 10. Others have taken recent pay cuts to help right-size the business and preserve jobs. *Id.* The Debtor's employees with the most valuable client relationships have so far chosen to stay with Debtor despite the business's struggles. *Id.*

The COVID-19 pandemic made matters far worse. Miller Decl. ¶ 11. Broadway theaters and shows are an important part of the Corinthian Companies' core client base, representing roughly a third of total revenue in 2019. *Id.* With practically no Broadway shows operating until relatively recently, a significant portion of the business revenue evaporated overnight. *Id.* Revenue from the Corinthian Companies' Broadway / theater business segment dropped 78% from approximately $20.2 million in 2019 to approximately $4.5 million in 2020. *Id.*

## D. The Paycheck Protection Program Loans

The relief afforded by the Payroll Protection Program ("PPP") was a much-needed lifeline for the Corinthian Companies' business and the Debtor's employees. Miller Decl. ¶ 12.

On May 8, 2020, the Debtor received a first draw PPP loan of $448,985.00. All of the loan proceeds were used to pay the Debtor's payroll, and the loan was forgiven on September 20, 2021. Miller Decl. ¶ 13. On March 9, 2021, the Debtor received a second draw PPP loan of $449,331.70. As with the first draw loan, all loan proceeds were used to pay the Debtor's payroll. Miller Decl. ¶ 15. The second draw PPP loan was forgiven on November 29, 2021. *Id.*

None of the Non-Debtor Entities applied for or received their own PPP loans. Miller Decl. ¶ 18. Nor did any of the Non-Debtor Entities receive any of the proceeds from the PPP loans issued to the Debtor. *Id.* All PPP funds that the Debtor received were used to pay its employees and preserve their jobs—exactly the usage that the funds were made available for. *Id.*

Mr. Miller personally did not receive any of the PPP loan proceeds whatsoever. *Id.* ¶ 19.

**E.      The U.S. Trustee's Motion**

On June 15, 2022, less than three months after the Petition date, the UST filed the instant motion to remove the Debtor as DIP and thus place the Subchapter V Trustee in charge of operating the business of the Debtor under § 1183(b)(5).  ECF 37.  In the motion, the UST asserts that the Debtor "Fraudulently Obtained the PPP Loans" (UST Br. at 13), including by "fraudulently report[ing] the quarterly gross receipts of Media, Broadcast Buying, and Trading (not the Debtor)."  *Id.* at 14.  By letter dated June 28, 2022, the UST notified the Court that it had just become aware of SBA rules published in January 2021 that require including the gross receipts of affiliates in PPP revenue calculations.  ECF 43.  In its moving brief, the UST provides one sentence regarding the Subchapter V Trustee's alleged qualifications to operate the business of the Debtor.  *See* UST Br. at 15.

**LEGAL ARGUMENT**

**THE TRUSTEE FAILS TO ESTABLISH CAUSE TO
REMOVE THE DEBTOR IN POSSESSION**

**A.      Legal Standard**

In a Subchapter V bankruptcy, the debtor remains in possession of the assets of the estate as DIP, with the rights, duties, and powers of a traditional Chapter 11 DIP, including operation of the debtor's business.  *See* 11 U.S.C. §§ 1184, 1186(b).  Under § 1185(a), however, "a party in interest" may seek the court's removal of the Subchapter V DIP "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor, either before or after the date of commencement of the case . . . ."  11 U.S.C. § 1185(a).

In assessing whether to remove a Subchapter V DIP "for cause" under § 1185(a), courts have been guided by caselaw construing 11 U.S.C. § 1104(a), which governs appointment of a

trustee in a traditional Chapter 11 case and contains identical language. *See, e.g.*, *In re Neosho Concrete Prod. Co.*, No. 20-30314, 2021 WL 1821444, at *8 (Bankr. W.D. Mo. May 6, 2021) (*citing In re Peak Serum, Inc.*, 623 B.R. 609, 614 n.1 (Bankr. D. Colo. 2020)). Courts have taken "a 'flexible' approach to determining whether cause exists to remove a [DIP], balancing competing interests to determine whether the costs of removal outweigh the benefits." *In re Neosho Concrete*, 2021 WL 1821444, at *8 (citing *Keeley and Grabanski Land P'ship v. Keeley (In re Keeley & Grabanski Land P'ship)*, 455 B.R. 153, 163 (B.A.P. 8th Cir. 2011)).

Removal of a DIP is "an extraordinary remedy," and "the movant's burden is high." *In re Neosho Concrete*, 2021 WL 1821444, at *8 (citing *Keeley and Grabanski Land P'ship.*, 455 B.R. at 163); *see also In re The 1031 Tax Grp., LLC*, 374 B.R. 78, 85 (Bankr. S.D.N.Y. 2007) ("The appointment of a chapter 11 trustee is an extraordinary remedy."). As the U.S. Trustee ("UST") concedes, it bears the burden of establishing cause for removal "by clear and convincing evidence." UST Br. at 13 (quoting *In re The 1031 Tax Grp., LLC*, 374 B.R. 78, 85 (Bankr. S.D.N.Y. 2007)); *see also In re Sillerman*, 605 B.R. 631, 640-41 (Bankr. S.D.N.Y. 2019) ("cause" for removal must be shown "by clear and convincing evidence"). Indeed, "[t]here is a strong presumption in favor of allowing a chapter 11 [DIP] to remain in possession." *In re Neosho Concrete*, 2021 WL 1821444, at *8 (citing *Keeley and Grabanski Land P'ship.*, 455 B.R. at 162); *see also 1031 Tax Grp.*, 374 B.R. at 85 (same). "The preference for retention of current management is stronger where the Debtor is a closely-held entity whose reputation and good will is closely identified with its owners and/or management team." *In re 4 C Sols., Inc.*, 289 B.R. 354, 370 (Bankr. C.D. Ill. 2003).

## B. The UST's Motion is Premature and Lacks Evidentiary Support

The UST jumped the gun by bringing this motion at the very outset of this case, based only on selective references to the Creditors' Meeting and a single declaration from Mr.

Huebscher summarizing matters he learned or came to believe at that meeting. There has not

been – nor could there have been – any investigation of the conduct of the Debtor. That is

because, unlike a traditional chapter 11 trustee, a Subchapter V trustee has no duty to investigate

the acts of the debtor and, in fact, may only do so "if the court, for cause . . . so orders."

*Compare* 11 U.S.C. 1183(b)(2), *with* 11 U.S.C. 1106(a)(3); *see also In re Ozcelebi*, 639 B.R.

365, 2022 WL 990283, at \*7 (Bankr. S.D. Tex. 2022) ("Unlike their counterparts in other

chapters, subchapter V trustees . . . are not required to investigate the debtor's financial affairs

unless the court orders it for cause.").

The UST and Subchapter V Trustee have not sought an order authorizing any

investigation in this case. Before claiming to have uncovered "fraud" (which they have not), that

should have been step one. *See In re Ozcelebi*, 2022 WL 990283, at \*8 ("[T]he Subchapter V

Trustee, and the UST . . . expressly had the power of § 1183(b)(2) at their fingertips, and yet

none of them ever sought an order from this Court requiring the Subchapter V Trustee to

'investigate [the debtor]' . . . . Parties should always use the tools provided by the Code to

mitigate waste of judicial resources. That was not done here."). Nor could the UST base this

motion on any prior findings of fact by another court or agency because the Debtor and its

principal, Mr. Miller, have never before been accused of any wrongdoing by any government

agency or found liable for fraud or mismanagement in any private litigation. Miller Decl. ¶¶ 24;

*contra In re Ashley River Consulting, LLC*, Case No. 14-13406 (MG), 2015 WL 1540941 (Bank.

S.D.N.Y. 2015) (granting UST's motion to appoint trustee, where debtor's principal was "found

to be guilty of affirmative fraud and gross, wanton, and willful misconduct" in prior litigation).

The UST brought this motion without anything close to the "clear and convincing"

evidence needed to overcome the "strong presumption" in favor of permitting the Debtor to

remain in possession. *1031 Tax Grp.*, 374 B.R. at 85. As shown below, there is no evidence of fraud, gross mismanagement, or conflicts of interest, and the UST's attacks on Mr. Miller's credibility are unsubstantiated and misplaced. In addition, the UST does not even address whether removing the Debtor in favor of Mr. Huebscher would on balance benefit the creditors, equity holders, and the estate. In fact, it would be fatal to the Debtor and gravely harm its creditors. All of this means the UST's motion should be denied in its entirety.

### 1. The UST Fails to Demonstrate Fraud

The UST asserts, but fails to prove, that "[t]here is cause to remove the Debtor as debtor in possession based on fraud" in the Debtor's two PPP Loan Applications. UST Br. at 13. The UST bases its "fraud" allegation on what it calls "incorrect information" on two PPP Loan Applications. *Id.* The UST then speculates it is "highly unlikely" that the Debtor provided the incorrect information "mistakenly," in a single paragraph without citation to any document or testimony. *Id.* at 14. That is all. The UST does not allege, let alone prove, that any PPP funds were used for unauthorized purposes or diverted (because they were not). All PPP funds were used to pay the salaries and commissions of the Debtor's employees, except for Mr. Miller, who has taken no compensation since 2016. Miller Decl. ¶¶ 9, 18. Nor does the UST allege that the Debtor inflated its employee count to increase the amount of any draw. Meanwhile, the Debtor is actively and transparently dialoguing with the U.S. Attorney's Office and the SBA to address and resolve the PPP issue.

Remarkably, after accusing the Debtor and Mr. Miller of "fraud" for misapplying new and complex federal regulations defining "affiliates" for purposes of the PPP program, the UST has walked back its fraud theory in its June 28, 2022 letter to the Court, in which the UST now concedes that the UST's Office first became aware of the governing SBA rule issued in January 2021 *after* filing the instant motion. *See* ECF 43. The UST's eagerness to accuse Mr. Miller and

the Debtor of fraud without due investigation is irresponsible.

"The cases in which fraud on the part of the debtor in possession justified the appointment of a trustee are not numerous and rest on clear and convincing facts." *In re LHC, LLC*, 497 B.R. 281, 305 (Bankr. N.D. Ill. 2013) (quoting *In re F.A. Potts & Co.*, 20 B.R. 3, 5 (Bankr. E.D. Pa. 1981)).  Cases defining fraud under § 1104(a)(1) – and, by extension, under § 1185(a) – "do so by reference to state common law fraud elements," such that the party seeking removal "must produce evidence that would allow this Court to conclude that each element has been established by clear and convincing evidence." *In re LHC, LLC*, 497 B.R. at 305-08 (movant failed to establish fraud as basis for removal of debtor).  Under New York law, the elements of fraud are: "[1] a misrepresentation or a material omission of fact which was false and known to be false by defendant, [2] made for the purpose of inducing the other party to rely upon it, [3] justifiable reliance of the other party on the misrepresentation or material omission, and [4] injury." *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (N.Y. 1996)).  "Allegations [of fraud] that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  Here, the UST has not even tried to prove each of the fraud elements and has therefore failed to raise a prima facie case.

Beyond the facial deficiencies, the UST ignores testimony at the Creditors' Meeting and other evidence of an innocent, nonfraudulent explanation for the mistakes in the Debtor's PPP loan applications.  Specifically, the UST takes issue with two aspects of the Debtor's PPP loan applications: (1) answering "No" to the question, "Is the Applicant or any owner of the Applicant an owner of any other business, or have common management with, any other business?", on the first and second applications; and (2) aggregating the quarterly gross receipts of Media,

Broadcast, and Trading to calculate the Debtor's reduction in gross receipts between comparable quarters in 2019 and 2020 on the second application. UST Br. at 13-14. As to both issues, the UST fails to establish clear and convincing evidence of fraud.

### *The "Other Businesses" Question*

Mr. Miller testified at the Creditors' Meeting that the Debtor's answer of "No" to the "other businesses" question was a "mistake." 6/9/22 341 Tr. (ECF 37-4) at 29:19-30:12. Mr. Miller explained that he relied on his outside public accountant, Michael Block, in answering this question. *Id.* at 30:7-12. Like Mr. Miller, Mr. Block testified that the response "appears to be a mistake." *Id.* at 30:18. Mr. Block also testified that he believed Bank of America assisted with the Debtor's first PPP loan application. *Id.* at 28:22-23. Mr. Miller recognized that he did not review the applications "as carefully as I should have" (*id.* at 30:7-12), but nothing in his testimony or that of Mr. Block provides clear and convincing evidence of knowing falsity, as required to prove fraud. *See Premium Mortg. Corp.*, 583 F.3d at 108.

The UST's conclusory allegation that "[i]t is highly unlikely" that the Debtor provided the incorrect response "mistakenly" (UST Br. at 14) is pure speculation and insufficient to establish fraud. *See ATSI Commc'ns, Inc.*, 493 F.3d at 99. Further, Section 717(a) of the New York Business Corporation Law provides that, "[i]n performing his duties" as a director of the Debtor (a New York corporation), Mr. Miller was "entitled to rely on information, opinions, reports or statements . . . prepared or presented by . . . public accountants or other persons as to matters which the director believes to be within such person's professional or expert competence." N.Y. Bus. Corp. L. § 717(a); *see also Berman v. Le Beau*, 62 B.R. 262, 268 (S.D.N.Y. 1986) (concluding, in suit by trustee in bankruptcy against former directors for breach of fiduciary duties, that directors had the right under § 717, since they acted in good faith, to rely

on financial statement of accountants, reports of attorneys and approval by bank-lenders). The evidence that Mr. Miller relied on application documents prepared by a public accountant and banking professionals raises a Section 717 safe-harbor defense that further erodes the UST's fraud allegation.

Further, while there is no dispute that the Debtor should have answered "Yes" to the Other Businesses question and attached the associated addendum, this mistake did not affect the Debtor's eligibility to receive its PPP loans, because none of the Non-Debtor Entities have any employees, and the Debtor was at all times well within the employee limit to qualify as a small business. *See* Miller Decl. ¶¶ 14, 16. On this record, the UST cannot show that the Debtor's mistaken answer to the Other Businesses question was material – another fatal flaw in its "fraud" accusation. *See Premium Mortg. Corp.*, 583 F.3d at 108.

### *Revenue Reduction Calculation*

The UST's arguments with regard to the calculation of the Debtor's gross receipts in its second PPP loan application is entitled to no weight whatsoever. In their moving papers, the UST and the Subchapter V Trustee alleged that the Debtor's revenue-reduction calculation was incorrect because the Debtor aggregated the receipts of three affiliates instead of using its own gross receipts. *See* UST Br. at 6, 14; Huebscher Decl. ¶¶ 14-22. Indeed, the UST attempted to create the impression that the Debtor used three affiliates' gross receipts purely to manufacture a 25% loss in revenue, rather than to reflect the its actual financial results. UST Br. at 5-8, 14.

That narrative entirely ignored Mr. Miller's testimony on how the Debtor's business works. Specifically, the Debtor's business is to provide services to its affiliates, the Non-Debtor Entities. *See* ECF 34 ¶¶ 2-7. The Debtor itself is not an operating company that performs services in the marketplace; rather, the Non-Debtor Entities perform services for third parties,

while the Debtor serves as "an overhead company" that employs the Corinthian Companies' personnel and "pays salaries, commissions and general overhead . . . associated with the media business." 5/5/22 341 Tr. (ECF 37-3) at 16:17-24, 17:12-16; *see also* ECF 34 ¶ 3; Miller Decl. ¶¶ 5-6. As Mr. Miller explained at the Creditors' Meeting, "the net profits of the other companies end up in [the Debtor], who then pays out salaries and commissions and related expenses for the running of the business." 6/9/22 341 Tr. (ECF 37-4) at 17:3-6; *see also id.* at 18:3-9; Miller Decl. ¶¶ 5-6. Under this structure, the Debtor's revenues decline in proportion to the decline in revenues earned by the three Non-Debtor Entities.

That is exactly what happened to the Corinthian Companies when the pandemic began. Revenue from the Broadway / theatre industry historically represented approximately one-third of the Corinthian Companies' overall revenue. Miller Decl. ¶ 10. As a result of the pandemic, the theater segment collapsed. Revenue from Broadway declined *78%* from $20.2 million in 2019 to $4.5 million in 2020. *Id.* In these dire circumstances, the Debtor applied for PPP loans for the exact reason the program was put in place: to prevent the Corinthian Companies from going out of business and the Debtor's employees from losing their jobs in times of severe hardship resulting from the pandemic. Miller Decl. ¶¶ 10-11; 86 FR 3712, at 3712-13, 3715 (explaining that "a primary purpose of the PPP" is for small businesses to "retain employees").

Neither the UST's motion nor the Subchapter V Trustee's declaration makes any mention of the testimony regarding the Corinthian Companies' business structure, because they know it provides an innocent, good faith explanation for the revenue-reduction calculation in the Debtor's second PPP loan application. That is, because the Debtor's gross receipts derive from the revenues of the three Non-Debtor Entities, aggregating the quarterly gross receipts of the Non-Debtor Entities accurately reflects the Debtor's quarterly gross receipts in a given quarter.

*See* Block Decl. ¶ 5; Miller Decl. ¶¶ 5-6. On this record, the UST cannot show that the Debtor committed fraud in calculating a revenue reduction on its second PPP loan application by aggregating the revenues of its affiliates. *See In re LHC, LLC*, 497 B.R. at 307 (failure to show fraud as basis for debtor removal where debtor offered "plausible" nonfraudulent explanations, raising doubt that the Debtor "intended to mislead anyone or to commit fraud").

Now, at the eleventh hour, the UST has conceded that the governing SBA rule actually *required* "adding the gross receipts of the business concern with the gross receipts of each affiliate" when calculating gross receipts. ECF 43 (quoting 86 FR 3712, at 3718). This is what the Debtor and its accountant made a reasonable, good faith effort to do by aggregating the revenues of the Non-Debtor Entities in the second PPP application. *See* Block Decl. ¶ 5; Miller Decl. ¶¶ 5-6. With the UST's June 28 letter, the record now demonstrates that the Debtor's approach to calculating revenue loss not only provided an accurate picture of its financial condition, but, as the UST concedes, also finds support in the governing SBA rule. Although circuitously, the UST now acknowledges that its original theory was wrong. *See* ECF 43 ("[T]o the extent it could be inferred from the Motion and Declaration of Eric Huebscher that the Debtor should not have used Trading's, Media's, and Broadcast Buying's gross receipts for calculating its gross receipts reduction, such inference would be incorrect.").

Yet this concession by the UST does not go far enough. The reality is it would be *correct* to read the motion and Mr. Huebscher's declaration as accusing the Debtor and Mr. Miller of committing fraud by using the Non-Debtor Entities' gross receipts, rather than only those of the Debtor, to demonstrate revenue loss. In fact, the UST made Mr. Huebscher's questioning of the Debtor's accountant about affiliate revenues a central feature of the motion. *See* UST Br. at 6-8 (quoting 6/9/33 341 Tr. at 37:1-38:1 ("So why didn't you use the taxpayer ID revenue for the

Debtor for the applicants in the second PPP loan application . . . . If they're separately distinguished, legal entities with separate taxpayer IDs filing separate tax returns, why were – why didn't you use the amount directly from the taxpayer ID associated with the applicant, which is the Debtor?")); *see also id.* at 14. As it turns out, had the Debtor reported only its own revenue, as Mr. Huebscher insisted should have been done, that would have been inconsistent with SBA rules, as the UST now recognizes. *See* ECF 43. This fundamental error in UST's request to remove the Debtor for "fraud" is an independent basis for denial of the motion in full.

In an attempt to cover its glaring error, the UST now shifts its theory entirely to arguing that the Debtor's second PPP loan application should have aggregated not only the revenues of the Non-Debtor Entities, but also those of "the approximately 30 other limited liability companies owned by Mr. Miller and any other entities owned or managed by Mr. Miller." ECF 43. However, this new theory appears inconsistent with the purpose of the PPP loan program and its affiliate rules. Second draw PPP loans were authorized by Congress "to provide expeditious relief to America's small *businesses*" (86 FR at 3712-13 (emphasis added)), because "only businesses that are still in operation will retain employees, which is a primary purpose of the PPP." *Id.* at 3715. Thus, when considering affiliates for purposes of the PPP loan program, the SBA is interested in *businesses*. *See* Huebscher Decl. Ex. F (Debtor's Second PPP Loan App.) (ECF 37-7) at 1 ("Is the Applicant or any owner of the Applicant an owner of any other *business*, or have common management with, any other *business*?") (emphasis added).

The other entities in which Mr. Miller holds interests are not "businesses" in any traditional sense. They are vehicles for investments, primarily in real estate. Miller Decl. ¶¶ 3-4. The holding companies owned by Mr. Miller do not sell goods or services, and they do not have customers or employees. *Id.* The investment vehicles are also completely separate from the

business of the Debtor and the Non-Debtor Entities. *Id.* Any monies Mr. Miller earns or loses from these other investments have no bearing on the revenues of the Debtor and the Non-Debtor Entities or their ability to support the compensation of the Debtor's employees. *Id.* It would appear contrary to the purpose of the PPP loan program to deny second draw loans to struggling businesses with *bona fide* revenue losses and jobs at risk due to wholly unrelated investments by an owner.

Further, the SBA rules governing treatment of affiliates in the second draw revenue-loss calculation were new, complex, and evolving standards with which the Debtor and its accountant made a good faith effort to comply. *See* Miller Decl. ¶¶ 17-20; Block Decl. ¶¶ 5, 8. Nothing in the record suggests otherwise, let alone establishes the knowing falsity required to prove fraud. *See Premium Mortg. Corp.*, 583 F.3d at 108. Mr. Miller and Mr. Block are not attorneys. The fact that the UST and Subchapter V Trustee themselves based their motion on a significant error in interpretation of the SBA rules and abruptly changed course further illustrates that the errors (if any) in the Debtor's revenue-reduction calculation were not intended to deceive the SBA. *See Am. Home Assur. Co. v. Merck & Co.*, 386 F. Supp. 2d 501, 519 (S.D.N.Y. 2005) ("Numerous court decisions have refused to allow federal agencies to punish private parties who have taken action based on a reasonable interpretation of an ambiguity in a complex regulatory scheme, even when the federal agency ultimately adopts a contrary interpretation of the ambiguity that is itself reasonable.").

In the end, there is no allegation – nor could there be – that the Debtor or Mr. Miller diverted any PPP funds for any unauthorized purpose. All PPP funds extended to the Debtor were used to pay salaries and commissions of its employees during times of significant revenue loss and financial hardship. 6/9/22 341 Tr. (ECF 37-4) at 31:24-32:4; Miller Decl. ¶¶ 18, 20. On

this record, there cannot be a finding of fraud. *See In re 4 C Sols., Inc.*, 289 B.R. 354, 371

(Bankr. C.D. Ill. 2003) (rejecting allegations of fraud where "there is no evidence that . . . [the]

majority shareholders and sole directors, have improperly used their power to line their own

pockets," and "no evidence that [a majority shareholder] ever used corporate funds to pay

personal expenses").

2.      **The UST's Allegations of "Gross Mismanagement" are Baseless**

The UST and Subchapter V Trustee attempt to cobble together various innocuous and

largely irrelevant allegations about the Debtor's business into a basis for removal for "gross

mismanagement." This attempt fails. Removal based on "gross mismanagement" under

§ 1104(a) or § 1185(a) requires more than "mere mismanagement," given that the primary focus

in a Chapter 11 case is to provide "a 'second' chance at business success," not to focus on "past

misconduct." *In re Sletteland*, 260 B.R. 657, 671-72 (Bankr. S.D.N.Y. 2001). Here, the UST

alleges matters that more reflect the running of a closely held small business than

mismanagement, much less gross mismanagement warranting removal.

For example, the UST alleges that the Debtor and Non-Debtor entities shared office

space, use a common email domain name, and do not have an intercompany agreement. *See*

UST Br. at 8-10. Yet the UST does not allege that any of this violates a legal or regulatory

requirement, concedes that the Debtor maintained a separate bank account from the Non-Debtor

Entities, and does not accuse the Debtor of comingling funds. *See* UST Br. at 15. Nor does the

UST allege that any coordination between the Debtor and the Non-Debtor Entities was intended

to or did defraud creditors. Showing that Mr. Miller owns and operates multiple, commonly held

companies with an aligned overall business purpose does not provide any evidence of "gross

mismanagement." *See, e.g.*, *In re Sundale, Ltd.*, 400 B.R. 890, 902 (Bankr. S.D. Fla. 2009)

(allegations of "failure pre-petition to observe corporate formalities" not a basis to appoint

trustee where single principal loosely managed multiple entities but there was "no evidence that the manner in which [the principal] operated his entities' cash pre-petition defrauded any creditors"). The UST fails to raise a *prima facie* case of removal for "gross mismanagement."

**3.** **The UST's Suggestion of a Conflict of Interest is Entirely Speculative and Contrary to the Record**

The UST's argument that the Debtor should be removed based on "conflict of interest" has no basis in the record and rests on pure speculation. Tellingly, the UST makes its "conflict of interest" argument "on information and belief" (UST Br. at 16), rather than based on any evidence of an existing conflict of interest. That alone establishes a threshold failure to raise a basis for removal on clear and convincing evidence. *See In re Sillerman*, 605 B.R. at 640-41.

Beyond that, none of the issues the UST alleges as potential conflicts provide a reason to remove the Debtor. First, the UST suggests that the Debtor should be removed because the Debtor may need to "dialogue with the SBA/U.S. Attorney's Office to determine if the PPP funds will need to be clawed back." UST Br. at 16. However, the Debtor has already begun such discussions through counsel, and will continue to be transparent and cooperative with the SBA. The Debtor's counsel of course represents the Debtor, not Mr. Miller, in this case. The SBA and U.S. Attorney's Office have not raised any objection to engaging with the Debtor under current management. Like other aspects of the UST's motion, this "conflict of interest" argument is premature and assumes its own conclusion that the Debtor's current management has engaged in misconduct, without the requisite proof.

The UST next suggests that the Debtor will need to "review the expenses paid by the Debtor on behalf of the Corinthian Enterprise to make sure the transfers to the Debtor were sufficient to cover the expenses." UST Br. at 16. Yet the motion fails to articulate any evidence that such transfers were not sufficient, or any reason why removal of the Debtor is necessary for

such review of expenses to occur.

The UST's suggestion that the Debtor will need to "investigate whether Mr. Miller has any basis to obtain past salary and commissions" is also contrary to the record. UST Br. at 16. It is undisputed that Mr. Miller has performed services since 2016 without any compensation from the Debtor or the Non-Debtor Entities. *See* 5/5/22 341 Tr. at 26:8-15; Miller Decl. ¶¶ 9, 23. Nonetheless, the Debtor has withdrawn Mr. Miller's claim to past compensation from its Schedule E/F because its counsel concluded that, although "the Debtor does agree that Mr. Miller has not been paid since 2016," the Debtor's counsel has "not been given backup which would demonstrate that claim." 6/9/22 341 Tr. (ECF 37-4) at 41:3-5; *see also* ECF 30. Far from evincing a conflict, this history demonstrates that the process is working under current management. Further, although Mr. Miller previously reserved his right to submit a proof of claim for past compensation (*id.* at 43:5-8), he is prepared not to do so in order to bring about a successful reorganization. Miller Decl. ¶ 23. Once again, the UST asks for the Debtor to be dispossessed preemptively before establishing the requisite facts.

The UST's vague suggestion that "[t]he parties and the Court can hardly expect Mr. Miller to investigate his own actions" (UST Br. at 16), carries no weight when the UST does not allege, let alone prove, the specifics of any investigation against Mr. Miller that management needs to launch. If the Subchapter V Trustee believes an investigation is necessary, he should "use the tools provided by the Code to mitigate waste of judicial resources," rather than prematurely seek to be installed at the helm of the Debtor. *In re Ozcelebi*, 2022 WL 990283, at *8. The UST has failed to establish cause for removal based on conflict of interest.

### 4. The UST's Attacks on the Debtor's and Mr. Miller's Credibility are Unfounded

The UST's suggestion that the Debtor has not been transparent in managing the estate is

unfounded. The UST's motion raises three issues, none of which demonstrate a lack of credibility or transparency, much less conduct rising to a level warranting removal of the Debtor.

First, the UST incorrectly states that "the Debtor failed to disclose in its 1007 Affidavit that it is part of the Corinthian Enterprise and that it was not a freestanding business of its own." UST Br. at 17. That is an incomplete and inaccurate characterization. In its original 1007 Affidavit, the Debtor disclosed that it was not a freestanding business, but instead "provide[s] bookkeeping and payroll for a media buying and trading company." ECF 5 ¶ 2. It is true that the Debtor did not name the Non-Debtor Entities, but that does not negate the fact that Mr. Huebscher was well aware of the nature of the Debtor's operations as early as April 8, 2022. Indeed on April 8, 2022, Mr. Miller on behalf of the Debtor, Mr. Huebscher, and Debtor's counsel had a lengthy call where Mr. Miller described, just as he did at the Creditors' Meeting, the nature of the Debtor's operations vis-à-vis the other Corinthian Companies. *See, e.g.*, 5/5/22 341 Tr. (ECF 37-3) at 16:17-24, 17:12-16; 6/9/22 341 Tr. (ECF 37-4) at 17:3-6, 18:3-9. In fact, it was from that initial conversation, the subsequent Creditors' Meeting, and various discussions with the UST and Mr. Huebscher, with such parties clearly understanding the nature of the Debtor's business operations, that the Debtor through counsel engaged in numerous discussions wherein the Debtor agreed to consolidate, for purposes of calculating disposable income for plan distribution purposes, the Debtor's and Non-Debtor Entities' financials. This was memorialized in the terms of a stipulation, which was all but finalized prior to the UST's filing of the motion before the Court.

At no subsequent time, including at the initial debtor interview or the initial Creditors' Meeting (where such was again discussed at length) did the UST or Mr. Huebscher object or otherwise identify any issues with the initial 1007-2 filing. It was not until the hearing held

before the Court on June 7, 2022 – where the Court raised the issue – that Mr. Huebscher took issue with the initial 1007-2 Declaration. Following the Court's direction at the June 7 hearing, the Debtor submitted its supplemental 1007-2 Declaration, which was circulated to the UST and Mr. Huebscher prior to filing, and which provided a more fulsome description and otherwise cured any issues with the initial document.

Second, the fact that the Debtor did not disclose that a trust for Mr. Miller's children has an ownership interest in the Debtor's landlord in the Debtor's motion to reject its lease (which was filed out an abundance of caution to eliminate any administrative cash burn, since the Debtor believed that it terminated its lease prior to the filing of the chapter 11 case) does not raise an issue of credibility. Again, Mr. Huebscher was well aware of this fact, as it was discussed during the initial April 8 call, was disclosed in the A.Y. Strauss retention papers filed with the Court, and was otherwise discussed at length with the UST during the course of discussions regarding the Debtor's retention of its counsel, as well as a teleconference between Mr. Huebscher, counsel to the Debtor, and counsel to the landlord which took place on April 29, 2022. Additionally, any doubt over this disclosure was cured with the Debtor's supplemental 1007-2 Declaration filed with the Court. Again to reiterate, the trust holds a minority, noncontrolling interest in the landlord, and there is no allegation, let alone evidence, that the trust in any way influences the landlord's business judgment, or that the trust's minority interest in the landlord influences the Debtor's business judgment. To the contrary, the landlord is diligently seeking recovery on its claim, and Mr. Miller is in an adversarial posture vis-a-vis the landlord irrespective of the trust's interest. *See* ECF 34 ¶¶ 17-20. Nonetheless, the Debtor disclosed the trust's approximately 20% interest in the landlord in its Supplemental 1007-2 Affidavit. *See* ECF 34 ¶ 20.[1]

---

[1] The UST and Mr. Huebscher also take issue with the fact that "the Debtor's April monthly operating

Far from demonstrating lack of transparency, these matters reflect that the Debtor is proceeding transparently while, at the same time, protecting its own rights in this Subchapter V case against what have, at times, been overreaching demands from the Subchapter V Trustee without a predicate order authorizing an investigation and in seeming contradiction to his duty to facilitate a consensual plan of reorganization. *See* 11 U.S.C. § 1183(b)(7); *In re Ozcelebi*, 2022 WL 990283, at *7 ("The subchapter V trustee [is] *tasked primarily with facilitating consensual plans*," and therefore "occupies a unique position as contrasted with its counterparts in traditional chapter 11 and other cases, who tend to be adversarial to the debtor by virtue of their duties to protect the bankruptcy estate and its creditors.") (emphasis added).

**C.     Removing the Debtor in Possession will Lead to Liquidation of the Debtor and Gravely Harm the Estate**

The analysis of whether to remove a debtor as DIP should include "balancing competing interests to determine whether the costs of removal outweigh the benefits." *In re Neosho Concrete*, 2021 WL 1821444, at *8; *see also In re LHC, LLC*, 497 B.R. at 293 ("Determining whether appointment of a trustee is in the interests of the various constituencies of the estate is fact-specific and requires the court to balance the benefits of such an appointment against its anticipated costs."). The UST's motion is silent on this balancing issue, providing further reason for the court to deny the motion on its face.

Although the UST fails to address the harm removing the Debtor and replacing him with

---

report did not include copies of its checks written." UST Br. at 17. This has already been remedied. *See* ECF 39. Additionally, they accuse the Debtor of failing to provide certain information regarding expense items incurred by the Debtor. That is simply not true, as such was provided in documentation circulated to the UST by Debtor's counsel by email dated May 16, 2022. Similarly, the UST and Mr. Huebscher assert that the Debtor failed to provide tax returns and formation documents regarding Broadcast Buying Services. That is also incorrect, as such was provided by email to the UST and Mr. Huebscher shortly after the initial request and several hours before the UST and Mr. Huebscher filed the motion.

Mr. Huebscher would cause, the fact is that such a result would be catastrophic.  Over nearly 50 years, the Debtor and Non-Debtor Entities have fostered a large client network within the media industry, who would almost certainly take their business elsewhere if Mr. Miller were no longer at the helm of the company.  *See* Miller Decl. ¶¶ 7, 22.  In turn, these client relationships are fostered by highly experienced and connected employees.  *See id.*  Transforming the Debtor from part of a media enterprise into a vehicle for Mr. Huebscher's envisaged investigations (and eventually, likely liquidation) will undoubtedly cause employees to leave or lose their jobs.  In turn, once the Debtor's employees leave along with their clients, the Corinthian Companies will undoubtedly be out of business for good.

Under these circumstances, where "the Debtor is a closely-held entity whose reputation and good will is closely identified with its owners and/or management team," the "preference for retention of current management" is particularly strong and outweighs potential competing concerns.  *In re 4 C Sols., Inc.*, 289 B.R. at 370-71; *see also In re LHC, LLC*, 497 B.R. at 296.  This bankruptcy should not be transformed into a forum for the Subchapter V Trustee to investigate the PPP loans and every non-Debtor business interest owned by Mr. Miller.  *See, e.g.*, Huebscher Decl. ¶ 36 (demanding information on all other LLCs owned by Mr. Miller, with no explanation of any relationship to the Debtor or need in this bankruptcy proceeding).  The UST has not attempted to explain how such an approach would serve the Debtor, its creditors, or the estate, because it would not.  As to the PPP, the SBA is aware of the situation and is fully capable of assessing and protecting its own interests.  The Debtor will continue to cooperate transparently with any such inquiry and does not need to be removed for that to happen.  The Debtor filed this Sub V bankruptcy to reach a consensual plan with its landlord and employees and move on with reviving its business.  That can and should still be done.

**D.** **The Trustee Fails to Establish that Mr. Huebscher is Qualified to take Possession of the Debtor or that Installing Him Would Serve the Interests of the Estate**

In what amounts to an afterthought, the UST states in a single sentence at the end of its brief that "Eric Huebscher is familiar with the case and its business and has relevant experiences . . . ." UST Br. at 18. This statement is at once inaccurate and insufficient. Contrary to the UST's statement, Mr. Huebscher does not purport to be familiar with the Debtor's "business." In fact, Mr. Huebscher does not claim to have any experience in the media / communications industry (*see* Huebscher Decl. ¶ 37), and Debtor is not aware of any. Mr. Huebscher's expertise appears instead to be in healthcare, as a "Patient Care Ombudsman in 18 cases in 6 jurisdictions over the past 13 years." *Id.* Mr. Huebscher's experience as a patient care ombudsman and forensic investigator is not relevant or helpful to running part of a media buying and planning business. *See 4 C Sols., Inc.*, 289 B.R. at 370 (expressing "preference for retention of current management" where good will of closely held business is "identified with its owners and/or management team"). But even if Mr. Huebscher had relevant experience that would serve the interests of the Debtor and the estate, the UST failed to present any such evidence in its motion. For this additional reason, the UST's motion to remove the Debtor as DIP should be denied.

Another reason to deny the UST's motion is that placing Mr. Huebscher in charge of the Debtor would cause significant "additional expense for the estate." *In re 4 C Sols., Inc.*, 289 B.R. at 370 (citing *Schuster v. Dragone*, 266 B.R. 268 (D. Conn. 2001)); *see also In re N. Star Contracting Corp.*, 128 B.R. 66, 70 (Bankr. S.D.N.Y. 1991) ("[A]ppointment of a trustee is an extraordinary remedy which will cause additional expense to the estate."). No doubt, if Mr. Huebscher's duties are expanded to include "operat[ing] the business of the debtor" under § 1183(b)(5), his administrative-expense claim for compensation from the estate will increase substantially, along with potential claims by other professionals he may hire to assist him. *See In*

*re Tri-State Roofing*, Case No. 20-40188-JMM, 2020 WL 7345741, at *1-4 (Bankr. D. Idaho Dec. 7, 2020) (discussing Subchapter V Trustee's right to hourly compensation as an administrative expense of the estate); ECF 12 ("I anticipate seeking compensation for my service in this case at an hourly rate of $425, in addition to seeking reimbursement for any actual and necessary expenses I incur.").

### E. The UST's Motion Should be Denied without Need for an Evidentiary Hearing

Due to its premature and speculative nature of the UST's moving papers, the instant motion fails to raise a *prima facie* case for removal. Said another way, the motion has not raised "disputed material factual issues," and it should therefore be denied without the need for an evidentiary hearing under Rule 9014(d). *See* Fed. R. Bankr. P. 9014(d). In no circumstances, however, could the motion be *granted* without an evidentiary hearing, given that the sparse moving papers fail to carry the UST's burden of proof. *See In re Sillerman*, 605 B.R. at 640-41; *In re The 1031 Tax Grp., LLC*, 374 B.R. at 85. Fairness dictates that the UST should not be given another mulligan to supplement the record after the UST and Subchapter V Trustee (i) elected to file this motion prematurely without first seeking leave to investigate the Debtor, (ii) did not request an evidentiary hearing in the moving papers, and (iii) already submitted a letter to the Court attempting to change its legal theory on this motion.

### CONCLUSION

For the foregoing reasons, the UST's motion to remove the Debtor as debtor in possession should be denied in its entirety.

Dated: New York, New York
June 30, 2022

Respectfully submitted,


Jordan M. Engelhardt
Heike M. Vogel
**A.Y STRAUSS LLC**
535 Fifth Avenue, 4th Floor
New York, New York 10017
646-253-6305

-and-

**A.Y. STRAUSS LLC**


By:_____*/s/ Eric H. Horn*_____
Eric H. Horn
101 Eisenhower Parkway, Suite 412
Roseland, NJ 07068
973-287-5006

*Attorneys for the Debtor and Debtor in Possession*