**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CORINTHIAN COMMUNICATIONS, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 22-10425 (MG) |

### DECLARATION OF LARRY MILLER IN OPPOSITION TO THE UNITED STATES TRUSTEE'S MOTION TO REMOVE THE DEBTOR AS DEBTOR IN POSSESSION PURSUANT TO 11 U.S.C. § 1185(a)

Pursuant to 28 U.S.C. § 1746, Larry Miller hereby declares as follows.

1. I am the President of Corinthian Communications, Inc., the debtor and debtor-in-possession in the above-captioned Chapter 11 case (the "**Debtor**"). I respectfully submit this declaration in opposition to the motion (the "**Motion**") of William K. Harrington, the United States Trustee for Region 2 (the "**United States Trustee**"), for an order removing the Debtor as a debtor-in-possession pursuant to 11 U.S.C. § 1185(a).

2. I founded the Debtor in 1974 as a full-service media planning and buying company dedicated to serving the New York City market. At the start, I was the sole employee. I ran all aspects of the Debtor's business by myself out of my apartment. The Debtor's business expanded over time, and with addition of new employees and business lines, the corporate structure of the business evolved. The Debtor now exists to provide employees and office services to the following non-debtor entities: Corinthian Trading Inc.; Corinthian Media Inc; and Broadcast Buying Services (each a "**Non-Debtor Entity**" and collectively, the "**Non-Debtor Entities**"). I am the sole owner of the Debtor and each of the Non-Debtor Entities.

3. In addition to operating the business of the Debtor and the Non-Debtor entities, I am also an avid investor. I personally have interests in a variety of entities (almost exclusively

limited liability companies) that hold interests in investments primarily in real estate. These investments are primarily minority interests in entities that I do not control. For the majority of the holding companies, I am a non-managing member and cannot make decisions. For certain limited liability companies, I am among the managing members, but in none of these cases, am I in control of the operation of the underlying real estate.

4. My personal investment vehicle entities are not "businesses" in the traditional sense. They do not sell any goods, provide any services, or have any customers, clients, or employees. These entities are merely holding companies that exist for the sole limited purpose of housing certain of my personal investments. They are completely separate from the business of the Debtor and the Non-Debtor Entities. Any earnings or losses I incur from these other investments have no bearing on the finances of the Debtor and the Non-Debtor Entities or their ability to support the compensation of the Debtor's employees. To the extent that entity operating the underlying properties receives rent or other gross receipts, I do not receive those receipts and typically do not receive a report of the amount of those receipts. To Other than the Debtor, I have never signed off on or participated in a PPP loan application for any other entity.

5. The Non-Debtor entities are operating companies that provide media services to third party clients. For example, clients engage Corinthian Media to provide media planning and buying services for their advertising campaigns. Clients pay Corinthian Media directly for those services, Corinthian Media pays the television and radio stations for the media time, and part of what is left over (Corinthian Media's margins are typically around 5%) is paid to the Debtor to cover payroll and overhead costs. Broadcast Buying Services operates similarly, focusing on clients that require direct response marketing and advertising services. Corinthian Trading's business is somewhat different. It primarily engages in barter transactions to acquire media time

at a discount and then sells that media time to Corinthian Media to make available to its clients. Corinthian Trading also pays the Debtor to cover payroll and overhead costs.

6. The Debtor is a service entity that employs all of the employees who support the operations of, and serve clients through, the Non-Debtor Entities. The Debtor uses the money that it receives from the Non-Debtor Entities to pay payroll and other overhead expenses. The Non-Debtor Entities do not have their own employees or overhead expenses.

7. Personal relationships are the lifeblood of the media planning and buying business. Salespeople and account executives have the client relationships that are the primary source of revenue. Buyers have the relationships with the television and radio stations necessary to satisfy those clients' needs. The Debtor's primary asset is, and always has been, its people.

8. The Debtor currently has twenty-six (26) employees (excluding me). Eleven have been with the Debtor for more than thirty years, nine have been with the Debtor for between ten and twenty-six years, and the newest employee has been with the Debtor for three years. All of the Debtor's employees are seasoned professionals who could take their experience and client relationships to other media firms that operate in the same space.

9. Even before the COVID-19 pandemic took hold in March 2020, business was not what it used to be. I have not received any compensation or profit distributions from the Debtor or any of the Non-Debtor entities since 2015. I have nevertheless worked tirelessly to keep the business operating to preserve the jobs of the Debtor's long-serving employees and continue providing valuable services to our clients.

10. The Debtor's employees have made sacrifices, too. More than half have not received raises in more than a decade. Others have taken pay cuts in recent years to help right-size the business and preserve jobs. The Debtor's highest-level employees with the most valuable client

3

relationships can take their business to any other agency in New York City, but they have so far chosen to stay with Debtor despite the business's struggles.

11. The COVID-19 pandemic only made matters worse. Broadway theaters and shows are an important part of our core client base, representing roughly a third of our total revenue in 2019. With practically no Broadway shows operating until relatively recently, a significant portion of the business revenue evaporated overnight. For context, Broadway-related revenue dropped from approximately $20.2 million in 2019 to approximately $4.5 million in 2020.

12. The relief afforded by the Payroll Protection Program ("**PPP**") was a much-needed lifeline for the business. It enabled the Debtor to preserve jobs and seek to turn the business around.

13. On May 8, 2020, the Debtor received a first draw PPP loan of $448,985.00. All of the loan proceeds were used to pay the Debtor's payroll, and the loan was forgiven on September 20, 2021.

14. On the Debtor's application for the first draw PPP loan, which was prepared by the Debtor's longtime accountant (Michael Block) and office manager (Charlotte Pelcman), we inadvertently answered "No" to the question asking "Is the Applicant or any owner of the Applicant an owner of any other business, or have common management (including a management agreement) with any other business?" This was a mistake, one that we immediately owned up to when asked about it during the section 341 meeting of creditors. We should have answered "Yes" and attached an addendum identifying the Non-Debtor Entities and describing their relationship to the Debtor. However, this mistake did not affect the Debtor's eligibility to receive its first draw PPP loan because none of the Non-Debtor Entities have any employees, and the Debtor was well within the 500-employee limit.

15. On March 9, 2021, the Debtor received a second draw PPP loan of $449,331.70. All of the loan proceeds were used to pay the Debtor's payroll, and the loan was forgiven on November 29, 2021.

16. On the Debtor's application for the second draw PPP loan, which also was prepared by the Debtor's accountant and office manager, we again mistakenly answered "No" to the question asking about other businesses. Like with the first draw PPP loan, that response did not affect the Debtor's eligibility because the Non-Debtor Entities still did not have any employees.

17. The second draw PPP application also required the Debtor to demonstrate at least a 25% reduction in gross receipts between comparable quarters in 2019 and 2020. As explained above, the Debtor does not itself generate any revenue. The Debtor's income consists of the money that it receives in the ordinary course of business from the revenue-generating Non-Debtor Entities. To perform the gross receipts calculation for the second draw PPP application, the Debtor aggregated the gross receipts of all of the Non-Debtor Entities and demonstrated a 29.88% reduction between Q3 2019 ($15,772,851.61) and Q3 2020 ($11,059,673.38). Analyzing gross receipts in this way was consistent with the Small Business Administration's regulations and guidance and accurately captured the decline in the Debtor's business by looking through to all of the Debtor's underlying revenue sources—i.e., the operations of the Non-Debtor Entities.

18. None of the Non-Debtor Entities applied for or received their own PPP loans. Nor did any of the Non-Debtor Entities receive any of the proceeds from the PPP loans that the Debtor received. All of the PPP funds that the Debtor received were used to pay its employees and preserve their jobs—exactly the usage that the funds were made available for.

19. Additionally, none of the personal investment vehicles that I wholly own and/or control applied for or received any PPP loans. That is because they are not businesses and do not

have any employees. I personally have not received a dime of the PPP loan proceeds that the Debtor received. All of the loan proceeds were used to pay the Debtor's hard-working employees.

20. While the Debtor and the Non-Debtor Entities may have a unique corporate structure, the business that they operate is precisely the type of small business that PPP loans were designed to reach and save. The PPP loans that the Debtor received served their intended purpose, allowing the Debtor to keep its doors open for long enough to weather the worst of the COVID-19 storm. Without those funds, the Debtor would have simply folded in the early days of the pandemic, and twenty-one families would have been affected by a sudden loss of employment.

21. The Broadway business has started to show signs of return as the COVID-19 recovery has accelerated—theater segment revenue for 2021 climbed back up to $8.6 million—but there is more work to be done to clean up the Debtor's finances and allow it to continue in business. The purpose of filing this Chapter 11 case was to make that happen.

22. Removing the Debtor as a debtor-in-possession and placing the Subchapter V Trustee in charge of its business operations will almost certainly lead to the swift death of the Debtor's business and end its nearly fifty-year history. The Debtor's employees have been loyal for many years, but they have their own families and futures to consider. There simply is no business without the Debtor's employees and their client relationships. If the employees lose faith in the process, then there is no point in trying to reorganize, and our good faith efforts to develop a plan that generates a meaningful recovery for the Debtor's creditors through this Chapter 11 case will have been for nothing.

23. My investment in this business is about more than just money—it is my life's work. I have not received any compensation from the business for seven years now, and I am prepared

to continue doing so (and to not pursue a claim for past compensation) to bring about a successful reorganization through this Chapter 11 case.

24. Prior to this motion, neither the Debtor, the Non-Debtor Entities, nor myself has been accused of any wrongdoing by any government agency or found liable for fraud or mismanagement in any private litigation.

25. For these reasons, I respectfully submit that the United States Trustee's motion should be denied.

26. I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 30, 2022

_____
Larry Miller