

August 15, 2022

**VIA ECF**

The Honorable Chief Judge Martin Glenn
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, New York 10004-4551

Re: Corinthian Communications Inc.; Case No. 22-10425; Subchapter V Trustee – Supplemental Status Report

Dear Judge Glenn:

This Supplemental Status Report ("Report") provides an update regarding the Subchapter V Trustee's ("Trustee") efforts since the hearing on July 21, 2022. The Trustee, consistent with the Court's Order Expanding the Subchapter V Trustees Duties [ECF No. 68], reviewed and analyzed a significant number of documents. In furtherance of this effort, to seek explanations for this new information, the Trustee spoke with the Debtor's principle, counsel to the Debtor, counsel to the Debtor's principal, the Debtor's accountant, and responsible employees. Additionally, the Trustee continued to work with the Debtor's and landlord's counsel in an effort to reach a consensual plan of reorganization. As in the past, the Trustee remained in contact with the Office of the United States Trustee ("OUST") and provided updates on the Trustee's work. This Report summarizes these efforts.

The Trustee received the following categories[1] of additional documents from the Debtor:

- Description of accounting services provided by the outside accountant
- Information concerning an entity named Corinthian Lending
- Credit Card Statements[2]
- Debtor Accounts Payable
- Debtor Check Deposits
- Debtor Expenses 2020 & 2021
- Debtor General Ledger
- Entities that L. Miller....Ownership Interest
- Example...How personal expenses are reconciled

---

[1] The descriptions identified below were taken directly from the Dropbox share drive provided to the Trustee by counsel to the Debtor.

[2] These credit card statements are personal statements of Mr. Miller and his domestic partner Ms. Cohen. The underlying credit cards were used by an affiliate of the Debtor i.e. Corinthian Media and for personal expenses of Mr. Miller and Ms. Cohen.



- Great-West Detail[3]
- Health Insurance
- LM Personal Credit Card Statements
- Non-Debtor Check Deposits
- Non-Debtor Disbursements
- Non-Debtor General Ledgers
- Payroll
- Subchapter V Information Request
- Tax Returns

The Trustee has not received the following documents and information requested from the Debtor:

- Remaining bank statements for newly discovered 2nd Debtor bank account i.e., Corinthian Communications, Inc. II[4]
- Detailed calculations of employee salaries
- Documentation of bonuses paid to employees in 2020 and 2021
- Tax return information for calendar year 2021 (Debtor and affiliated entities), including the K-1's for Mr. Miller

In several instances, the information contained in the above reviewed documents required further clarification. To assist with this effort, the Trustee held two conference calls with counsel to the Debtor, counsel to the Debtor's principal, Mr. Miller, Debtor employees and the Debtor's outside accountant. Despite this effort, several areas remained unresolved, pertaining to certain banking information, personal use of Debtor funds, calculation of employee compensation and tax return data for calendar year 2021. These unresolved areas are identified above.

The Trustee's overall impressions and conclusions from the First Status Report [ECF No. 62] remain unchanged. The Debtor is an inextricably woven financial enterprise with the Debtor's affiliated enterprises. The Trustee believes that these Debtor affiliates should have been listed as Co-debtors in the bankruptcy schedules. Additionally, the Debtor should have recorded a receivable from the Debtor's affiliated entities for all amounts due and owing, including but not limited to delinquent rent payments. The Debtor consistently relied on these Debtor affiliates to fund the expenses of itself and the affiliates. Mr. Larry Miller is the sole owner of the Debtor and its affiliates. Mr. Miller controls both sides of the accounting ledger. It is within Mr. Miller's sole discretion whether to fund the Debtor for the affiliates' expenses. In addition, the Trustee found evidence of a previously undisclosed Debtor bank account. This account appeared to contain exclusively personal expenses of Mr. Miller and his family. The account (Corinthian

---

[3] Great West is the benefits administrator for the Debtor.

[4] The EIN assigned to the Debtor and Corinthian Communications Inc. II bank accounts are identical.



Communications, Inc. II) did not show any reimbursement by Mr. Miller. The account contained over $350,000 in Mr. Miller's personal expense payments between 2016 and October 2020[5].

The sourcing and use of PPP loan proceeds has been extensively discussed during this case. The Trustee believes that the Debtor intentionally failed to disclose the existence of the Debtor affiliates in both PPP loan applications. It is unclear whether the loans would have been granted had the correct information been supplied at the time of loan origination. Further, Mr. Miller is a participant of another 40 entities, with ownership interests ranging from 0.2% to 100% minority/controlling interest. As further described below, Mr. Miller chose to use the proceeds of the two PPP loans exclusively for payroll purposes[6], despite having the flexibility to use up to 40% of these amounts on rent and other payments. The following analysis suggests that the Debtor employees' compensation actually increased as a percent of the overall gross receipts of the affiliated entities. This was at a time when overall business income was reduced by 20%. The Trustee does not believe that Mr. Miller had the discretion to exclusively fund payroll with the PPP loan proceeds given the overall business downturn experienced during the times of loan origination.

The Debtor and its affiliates are all Sub S corporations that flow directly to Mr. Miller's personal tax return. Mr. Miller benefits from both gains and losses from these entities. Losses offset income from other sources of income and gains inure directly to Mr. Miller's benefits. Mr. Miller's gains and losses reported to the Trustee were for years 2016 ($18,687), 2017 $8,040, 2018 ($497,641), 2019 ($802) and for 2020 ($138,085). Mr. Miller and his accountant would not disclose to the Trustee Mr. Miller's expected Sub S profit or loss for 2021. The Trustee estimates that Mr. Miller will receive in excess of $750,000 in ordinary income for 2021, principally from the financial result of one of the affiliates i.e., Corinthian Media, Inc. This income would be during a period in which the combined enterprises had a 20% reduction in gross receipts.

The landlord is the largest unsecured creditor in this case. The Trustee's review of the underlying lease did not reveal the existence of any personal guarantees nor did the lease allow for the tenant (the Debtor) to sublease. There is clear evidence that the Debtor affiliates (and possibly other entities controlled by Mr. Miller) used the Debtor's space to conduct business operations. The Debtor ceased making rental payments in May of 2020, shortly after receiving the first of two PPP loans. While the Debtor and its affiliated entities physically abandoned the space, the lease does not allow the Debtor to suspend rental payments. Given what appears to be a fairly significant downturn in business (>20%), the Trustee would have expected to see more than one vendor on the list of unsecured creditors. The Debtor needed to restructure its business, which should have included a review of all expenses. The Trustee was not provided with any evidence that the Debtor and its affiliated entities engaged in an overall restructuring exercise. As such, it does not appear that any other creditor was harmed by this business downturn, other than the landlord.

---

[5] The Debtor disclosed that this account had been closed. The last bank statement provided to the Trustee was in October 2020. This statement showed a remaining balance. The Trustee has requested the remaining statements. Those statements were not provided to the Trustee.

[6] In July 2020, Mr. Miller's domestic partner was hired by the Debtor.

office: 646.584.3141   fax: 212.202.3503
630 Third Avenue : 21st Floor : New York, NY 10017   www.HuebscherConsulting.com



The following discussion, analysis and charts show the actual financial results of the combined entities. Additionally, a more in-depth analysis of the changes in employee compensation is shown as compared to the changes in the business incomes. These two analyses form the basis for several of the above observations.

As explained in the First Status Report, the Debtor is the administrative arm of three closely held affiliates i.e., Corinthian Media, Corinthian Trading and Broadcast Buying Services ("Affiliates") [ECF No. 62]. The Debtor and Affiliates are owned 100% by Mr. Larry Miller ("Miller"). The Debtor and Affiliates all occupied the same office space[7]. The Affiliates regularly transferred funds to the Debtor for the payment of rent, salaries and other overhead related expenses. The Debtor has never engaged in any commercial outside business activity and relied exclusively on the Affiliates for funding purposes. The Trustee felt it is important to show the financial magnitude of the combined entities, in connection with the observations and conclusions reached during this portion of the investigation. The following is a summary of the Debtor's and Affiliates' financial performance between 2016 and 2020[8]

| Year | CORINTHIAN COMMUNICATIONS | BROADCAST BUYING SVS | CORINTHIAN MEDIA | CORINTHIAN TRADING | BBS, CMI, CTI Total | Gross Receipts yoy change |
|---|---|---|---|---|---|---|
| | Gross Receipts | | | | | |
| 2016 | $ 4,611,756 | $ 261,932 | $ 52,627,827 | $ 3,215,961 | $ 56,105,720 | |
| 2017 | $ 4,734,993 | $ 882,704 | $ 56,160,988 | $ 2,747,126 | $ 59,790,818 | 6.6% |
| 2018 | $ 5,031,019 | $ 369,606 | $ 48,458,162 | $ 3,051,548 | $ 51,879,316 | -13.2% |
| 2019 | $ 5,136,486 | $ 492,851 | $ 50,796,094 | $ 3,283,188 | $ 54,572,133 | 5.2% |
| 2020 | $ 3,780,003 | $ 624,141 | $ 40,917,892 | $ 1,805,498 | $ 43,347,531 | -20.6% |

The above chart shows that the Debtor and Affiliates received on average $53M on an annual basis. These funds were disbursed either to media related entities or transferred to the Debtor for the payment of salaries, benefits, rents and other professional expenses. A substantial portion of

---

[7] There is some evidence that one or more of Miller's enterprises may have used the landlord's address as its principal place of business. The Debtor has disclosed that at least one of the Debtor's employee's time was allocated on a shared service basis, covering the administration and support of multiple Miller enterprises.

[8] The Debtor was either unable or unwilling to provide detailed or summary information on their 2021 financial performance.

office: 646.584.3141    fax: 212.202.3503
630 Third Avenue : 21st Floor : New York, NY 10017    www.HuebscherConsulting.com



these funds were paid to the media companies that work with the Affiliates. The Trustee believes that employees are paid based on the performance of the Affiliates[9]. The following chart shows the payments to employees over the same period of time[10]:

| Year | Salaries | as % BBS, CMI, CTI Receipts | Salaries yoy Change |
|---|---|---|---|
| 2016 | $ 2,943,654 | 5.2% | |
| 2017 | $ 2,854,676 | 4.8% | -3.0% |
| 2018 | $ 2,792,144 | 5.4% | -2.2% |
| 2019 | $ 2,925,531 | 5.4% | 4.8% |
| 2020 | $ 2,618,131 | 6.0% | -10.5% |

As stated in the First Status Report (and above) the Debtor received two PPP loans. The Debtor informed the Trustee that these funds were used exclusively for the payment of salaries. The first loan, in the amount of $448,985.00, was received in 2020. On the application for forgiveness, Miller stated that the expenses of the applicant were payroll in the amount of $452,779.22, lease payments of $34,790.02, business utility payments of $4,073.28 and covered operations expenditures of $900. These expenses are valid categories for PPP loan forgiveness. The Debtor has informed the Trustee that none of the first PPP loan was used for anything other than payroll. The Debtor received a second PPP loan in 2021 in the amount of $449,331.69. The forgiveness paperwork does not state the Debtor's intended use of these funds. The Trustee was informed by the Debtor that all of these funds were used for payroll purposes.

The PPP program was intended to stabilize the workforce and prevent loss of jobs. From the analysis shown above, it would appear that the Debtor's employees (at least in the year 2020) sustained a consistent level of compensation. The chart also shows that the employee salary expense was slightly higher comparably as a percent of Affiliate receipts than in 2019. The chart shows that the employee's salaries in 2020 were reduced by 10.5%, during a period when the Affiliates experienced 20% drop in gross receipts. This change is consistent with the use of PPP loan proceeds exclusively for payroll purposes.

Miller initially filed a claim in this case for over $1.2M in unpaid wages. Miller subsequently withdrew this claim. Miller had initially claimed that he had not been paid by the Debtor for a number of years. While the Trustee found no evidence that Miller received a salary, the Trustee

---

[9] The Trustee requested the payment formula and calculations for each of the employees. The Debtor did not provide this information.

[10] The number of employees did not materially vary during these periods.

office: 646.584.3141   fax: 212.202.3503
630 Third Avenue : 21st Floor : New York, NY 10017   www.HuebscherConsulting.com



found several instances of benefit to Miller. Those included his ability to offset income from other business enterprises with the loses from the Debtor and Affiliates, use of Debtor funds for personal use, directing millions of dollars of business expenses through his personal credit card[11] among others. The Trustee does not believe that Miller is an injured party. Given the absence of any written agreements to substantiate Miller's claim, it is impossible to determine whether Miller's claim is real.

Miller clearly has benefited financially from the financial performance of the Debtor and Affiliates. These benefits include over $350,000 of personal expenses run through a shadow bank account in the name of Corinthian Communications Inc. II, the ordinary income and/or losses that were generated by these entities that inured to Miller's personal benefit, the employment of Miller's domestic partner and the channeling of millions of dollars of Affiliate expenses through his personal credit card[12]. Given Miller's exclusive control over the Debtor and Affiliate businesses, consideration should be given to extending the obligations of the Debtor and Affiliate's to Miller personally. The Trustee estimates that the aggregated financial exposure to Miller, the Debtor and Affiliate's range between $1,250,000 to $1,750,000[13].

This case is a two-party dispute between Miller and the landlord[14]. The Trustee has strongly suggested to both parties over the course of this case to reach a reasonable settlement. The Trustee believes that the landlord's claim is somewhat overreaching, while at the same time, the First Modified Chapter 11 Plan of Reorganization [ECF No. 66] (the "Plan") proffered by the Debtor needs significant bolstering. The Plan ") discusses a lump sum payment but does not discuss the use of disposable income over either a three or five-year period[15]. The Trustee supports that these discussions should continue to achieve a consensual plan of reorganization. This would be the best outcome for the businesses and its' employees. The insertion of the Subchapter V Trustee in place of the Debtor could conceivably be a temporary and short-lived solution, as the Debtor's employees might transition their employment to one of the Affiliates. A conversion to Chapter 7 would than likely result in a business dissolution. The latter case would yield a suboptimal conclusion for all parties.

The Trustee remains committed to achieving what is in the best interest of all constituents. This outcome can be best achieved with constructive discussions among the parties, either with or without the Subchapter V Trustee replacing the Debtor. The Trustee does not advocate a conversion of this case.

---

[11] Directing the Affiliate business expenses to Miller's personal credit card resulted in Miller receiving significant "concierge" and "service" credits. These credits were disclosed to the Trustee as "reward points". The credits inure directly to Miller's benefit. The Affiliates regularly paid their portion of the expenses. Miller trued up and paid his expenses on what appeared to be a quarterly, but irregular basis.

[12] The Trustee was provided with invoices for expenses paid by the Debtor. Those invoices included payments to two law firms. One of the law firms provided services to Miller's unrelated business enterprises and the other for Miller estate planning purposes.

[13] Further investigation may reveal causes of action against Miller's other entities.

[14] A Trust held in the name of Miller's children owns approximately 20% of the underlying property.

[15] The Plan does not include detailed information on the projected use of disposable income.

office: 646.584.3141  fax: 212.202.3503
630 Third Avenue : 21st Floor : New York, NY 10017  www.HuebscherConsulting.com



Sincerely,

Eric Huebscher
Subchapter V Trustee

office: 646.584.3141   fax: 212.202.3503
630 Third Avenue : 21st Floor : New York, NY 10017   www.HuebscherConsulting.com